I want to address four of the elements of the stalking statute. Harassment, the causation of substantial emotional distress that should flow from the stalking statute, and the other elements of the stalking statute. The implied threat, that is a threat implied by conduct, and the threat of specific intent. I think those are the four most horrific portions of the record for my client who's already now logged six and a half years on a crime he didn't commit by any reasonable, remotely tenable construction of the California statute. I'll begin with harassment, which is to seriously annoy, alarm, torment, and terrorize. Separate from the element of a threat, that is the prosecution had to show beyond a reasonable doubt that there was this harassment, and they had to show that there was a threat made with the intent to put Mr. Spielberg in fear, the harassment is also separate from the other possible theory of stalking under the statute which is repeated following. And it's an important distinction because although we could rationally understand how someone could be secretly followed, stalked in that sense, and learn about it after the fact from perhaps neighbors or friends, and become concerned. The notion that you could be harassed in any meaningful common sense, and under this statute, harassment without knowing about it until after it ceased is just unreasonable, untenable. It's unreasonable and tenable, perhaps, but if it's the California law we have to follow it. How do we deal with the California court's interpretation? Well, Your Honor, the district court below actually did cite, and we do not dispute, several cases that if it's an untenable interpretation of the law, this court doesn't have to follow it. And of course, what we're talking about is our precise case here, Norman, is the very first court to even construe such a remote series of facts because our case is so far removed from every other published decision before or since. And we ourselves cited Supreme Court authority in the reply brief when the government first raised this, that if it's an interpretation or an extension of the statute that could not reasonably be foreseeable either, the court need not follow it. And this case truly is way, way off the mark. If I could remind the court that the Karen case makes clear that the statute was passed in 1990, the first one in the country, when this young actress, Rebecca Schaefer, had been shot. Four other young women in about an 18-month period in California had been killed after having been stalked, that is an in-your-face pursuit by exes or current half-crazed boyfriend. They had gotten TROs precisely because they knew someone was hell-bent on causing them harm and driving them to the brink of insanity through fear short of that harm. Our case has none of those hallmarks, far outside the whole purpose of the statute, far removed from every other case, because while my client supposedly was harassing, that is annoying, terrorizing Mr. Spielberg, my client was in the Pacific Palisades. Mr. Spielberg didn't even know my client existed, let alone had found his way to the Spielberg residence in the Palisades until after the conduct had ceased, until any possible basis to become alarmed, annoyed, terrorized had evaporated. Would your argument be different if he had been instantaneously advised each time this person showed up, advised in Ireland? I think certainly it would have been much different. And I think the reason where the state court and then the district court has gone awry is they have been unable to maintain in mind that there are two elements. There's the threat and the harassment. And we've never contended, no one reasonably could contend that a threat has to be instantly conveyed and received. That would mean essentially only face-to-face or a phone threat when the victim picks it up. So of course you can make a threat and later you could read it. But the idea of harassment, I think any common sense interpretation, whether it's sexual harassment in the workplace or harassment, bullies in the schoolyard, it's something where somebody is in your face and you can't get rid of them. Your argument would be if Mr. Spielberg were inside his house but didn't happen to know about what was going on outside, there'd be no violation. If he were inside his house and just hadn't heard my client knock on the door or something? Yeah, he hadn't heard him knock on the door. He didn't know he was out climbing over the fence. He didn't know he had handcuffs, didn't know his intent on raping him. But he was inside the house, just didn't know about it. Would that be a violation? Not if he didn't become seriously annoyed, alarmed, terrorized. So as long as you don't know about the harassment, there's no stalking. That's our point, Your Honor, yes. And what's your best case for that proposition? Every other case has, of course, not had to address it because I don't think any prosecutors have the audacity to propose the theory. But every case, the facts of every case, Your Honor, which we summarized, I believe it's still everyone, in footnote 8 of the opening brief. Sorry, I don't read footnotes. You'll have to tell me what it is. Well, Your Honor, I discussed essentially and summarized all 18 cases. I think it's about 18 at that time. And in each one, not only do you have expressed threats or if it's implied it's waving a saber while you're chasing someone down the street, or a convicted arsonist in the McClellan case striking matches in front of his wife after he's threatened to burn their house down, telling her, do you know what this is? So you have something quite direct, unmistakable. And you also have horrifying physical contacts, that is, vandalism, face-to-face, you know, showing up in the workplace or showing up at someone's home and confronting them, or you have literally some of these people are so disturbed the defendants are making 50 or 60 phone calls or sending hundreds of letters in a week or so with terrible threats. So you have someone who really is stalking someone and is at pains to make the person know they're being stalked. We don't have any of that in this case. What we have is my client going to Mr. Spielberg's neighborhood on four occasions, twice, at the gate. So he never gets onto the property. The district court made a reference to trespass, which is absolutely unsupported in the record. Never speaks to Mr. Spielberg, never writes to him, never emails him, never defaces the property, never vandalizes, never writes obscenities on the gates. The first time this supposed jackal, predator, who supposedly has terrorized Mr. Spielberg, the first time he ever encounters Spielberg is at the trial. There's no case, none, not only in California, but based on the research I had done at the request of the district court, in any of the 50 states there's never been a case remotely like this one, where conduct that was unbeknownst to the victim until after it had ceased supported harassment. It doesn't even constitute a threat, but it's the single most disturbing portion of the case, I think, because the harassment in the stalking statute is precisely aimed at addressing some sort of conduct that the prosecutors could never before reach to stop people. Unless you had an attempt for some other crime, you couldn't get them off the streets. They created this crime, a statutory creation, with specific elements based on terror and getting in someone's face or repeated following. They didn't have that here, not by any stretch. But it gets worse. Even if the state court and the district court reasonably, tenably found that my client's conduct somehow constituted harassment under 646.9, what was that conduct that was related to Mr. Spielberg to cause him his supposed distress? Mr. Raymer, Bruce Raymer, Spielberg's lawyer, is the first and only person to talk to Mr. Spielberg about what my client's done. He talks to him on July 17th and then July 29th, way back in 97. Now, the indictment period for the misconduct is June 29th through the 12th, so we're already five and more days outside the supposed period of wrongdoing. What Mr. Raymer reports is not only the visits to the premises. As I said, there was no trespass, no screaming, hollering, or threats, none of that. But he also reports, basically, I've done some checking. This Norman fellow has a history of some assaults, and when he was stopped on one occasion and they searched his person's briefcase and car, they found the so-called break kit. I'm not saying that Raymer used that phrase, but the prosecutor later used it, the duct tape, handcuffs, and a box cutter knife. So he tells him that as well. On the 29th, he also relates to Mr. Spielberg what he has learned, several steps of hearsay, through interrogations of Mr. Norman by the private security force at Spielberg and the police while he's in custody. Namely, for the month prior to the indictment period, Mr. Norman says, I became obsessed, increasingly obsessed, with having some sort of a homosexual relationship with Spielberg. They also, so their relating has this obsession, rape fantasy, all of which is then conveyed in these two phone calls to Mr. Spielberg. Well, that could well scare you. I'm not here to argue against that. That's not my client's conduct. My client didn't ask Mr. Raymer to report anything, didn't instruct him to report anything, didn't tell his interrogators. Imagine, here he is cooperating. Every officer's dream, you go into the joint and you ask the defendant questions instead of saying, get me my lawyer, he's answering the questions. He didn't say, be sure to tell Mr. Spielberg that I had these obsessions, these fantasies, that were only in his diary and never disclosed to Spielberg in any form. That's what terrorized Mr. Spielberg, if anything did. He had somebody who, although he never crossed on his property, never talked to him, was certainly in the vicinity, and he had some very strange, very disturbing obsessions and fantasies directed at Mr. Spielberg. But this is not a case about having bad fantasies or strange obsessions. That's not a crime. This isn't some intent to rape case or to burglarize. Those weren't theories either. They didn't even charge him with loitering or trespass. And, of course, the police didn't arrest him for stalking because they didn't think it made stalking, and he had a parole violation for failing some drug tests. So it's months later they came up with the stalking. But the essence of the crime is an intent and an activity designed to put Mr. Spielberg in fear. And the person who put Mr. Spielberg in fear was Raymer, reporting all sorts of things that my client never tried to disclose. He didn't wave the handcuffs in front of Mr. Spielberg like McClellan when he struck his matches. He didn't send a copy of his diary to Mr. Spielberg saying, you know, here's your next movie. None of that stuff. It was all related by Raymer through information obtained in interrogations. Again, no known case in California or any other state has involved such a strange set of facts where the worst conduct was not the conduct or the statements, implied or otherwise, of the defendant, but of people who are essentially investigating what they think might be disturbing behavior or even if they thought it was a crime. And they proceed to relate the fruits of their endeavors to Mr. Spielberg. And what's really disturbing, the district court at pages 151 and 158 of the excerpt, footnotes 9 and 12, sort of gives us half a bone at one point. It says, well, even if we took your theory to heart that these incidents that occurred long after the indictment period and through Raymer's phone calls on the 17th and 29th of July, even if we put that aside, I think, the district court said, I think that the visits themselves, that is without disclosing the rape case, just the visits showing up, misrepresenting your purpose and being there, coming back after they tell you, beat it, buddy, which you did, that's enough under the statute. Now I submit that's preposterous, utterly unreasonable, untenable, because it would fail to distinguish it from any number of circumstances with the religious zealots that I'm subjected to in Hollywood when they ring my bell or persistent salespeople who will frequently tell you anything to get to talk to the lawyer that they think can buy books or office supplies. But worse than that, this jury didn't have an opportunity and my client didn't have an opportunity to have that conduct judged under 646.9. What the jury had and what my client was subjected to was information about his visits and then a boatload of evidence about homosexual rape, obsessions with Spielberg, tying him up and making his wife watch, none of which was offense conduct, all of which went before the jury. So it's one thing for the district court to say, I'm confident that I could segregate this and find enough, but the jury never had that. Well, what was Spielberg's testimony about what caused him distress? Actually, what he said was, well, when I heard, on the first time, when I heard from Mr. Raymer about his episode, which included the rape case on the 17th, I could only, I think he said, I could only wonder what he was up to and what he could do to me or my family. Well, that's true. I mean, you would wonder, although it wasn't called the rape kit then. Handcuffs, duct tape, and a box cutter. You don't have to be an Einstein to put together that might involve some sort of conduct you wouldn't want to be near. And, you know, I can't beef that he's concerned about that. But again, my client didn't disclose the rape kit, didn't reveal it was seized from him. So we'll never know whether Mr. Spielberg would have claimed to have been just as distressed and whether his distress would have met the statutory elements if all he had learned was this fellow came by the house on June 29th. He was told to leave, and he did. And all he said, I want to see Steven Spielberg. And then he came back 1 a.m. on the 11th. He was found across the street. He doesn't even mention Spielberg. He's told to beat it again, and he does, but doesn't mention Spielberg. Comes back again 7 a.m. on the 11th, found in a few bushes a few blocks away from the estate. Doesn't yell or say anything about Spielberg until he's taken into custody, although he's later released that day. That's how dangerous they think he is. He claims to be the adopted son of Spielberg. His name's David. He was being chased by jackals owned by Spielberg. Maybe a mental health issue, and it does reference Spielberg. But again, no threats of any sort, and no request to even see Spielberg. And then finally he comes back at 5 p.m., found on a public street two blocks from the estate, taken into custody. That's the psych hold, and that's the incident where he backs the car into the driveway. But again, he's not yelling, Steven, I'm here to see you. I'm coming to get you. I'm going to beat this door down. There's no threats. So even if what actually had happened on the two times, not four, just two times, that he was outside the premises, not on the premises, had accurately and completely been conveyed to Spielberg, who knows what would have happened. But that's not the point. Do I understand your argument is whatever harassment is, that it has to be by actual conduct that we judge it. That is, if a man walks after a woman every time she comes out of the house, if she doesn't know he really wants to rape her, there's no harassment just because he's following her, because she doesn't know his mental intent. Correct. That would be a repeated following case, Your Honor. I think that would be a better chart, but it wouldn't be harassment. It would not be harassment. So you have to set aside what the person intends to do. You might not know that they have a gun in their waistband or whatever. As long as what they're doing doesn't show anything, then the statute's not violated. Correct. But I don't, to the extent, I don't want the Court to misunderstand me. I don't believe that the defendant's intent is irrelevant, because harassment has to be willfully and maliciously corrected. It has to prove it. But we're talking about harassment now. Right. And you're saying the part of that is that without speculation, the victim has to know that this person is going to rape them, this person is going to attack them, and merely being around the premises or following the person along, that's insufficient. Well, being around the premises or following, if the victim becomes aware of it, could, depending on the context, the history of the individuals, that could cause you a great deal of concern. But, again, in our case, there is no prior history to be redundant. Mr. Spielberg never heard of Norman, never seen him. It's all about June 29th and July 11th. That's the only, quote, unquote, contact they have. And, of course, Mr. Spielberg didn't learn of that. I assume you concede that once he found out what he did find out, that he felt harassed at least enough to protect his mother and to get additional guards around his home. Well, I wouldn't want to concede he felt harassed. That begs the question and probably takes the rug out from under me. I will concede he sure was concerned. Yeah. But, again, I could be concerned if I come home from vacation and find out that some helicopters are overnight in Hollywood all the time, that somebody's hiding in my backyard and police were looking for him. I'd be very concerned. I might check my security. That doesn't mean I've been harassed or threatened. I've just had a near miss. I've had the misfortune to be close to the scene of a potential crime or close to the neighborhood of a disturbed person. That's not an offense, at least not yet. I see I only have one moment. I'm going to try in 15 seconds and perhaps save 45 seconds. But my greatest concern is answering the questions of the Court, not, with all due respect, responding to the Attorney General. I'd like to jump to intent to cause fear. Critical element because the Heilman case says, not surprisingly, this is a very broad statute in specific intent. We'll narrow it. The District Court of Appeal for California used a negligence standard. Foreseeability. The District Court has tried to square that circle. It can't be done. The District Court essentially says, and I apologize, I don't have the excerpt right handy, but that, well, Mr. Norman's conduct clearly was done intentionally. And, of course, we don't say he accidentally found himself in the Pacific Palisades and was dropped off by a cab thinking he was going to be in Malibu. He went there intentionally. But the issue is, was his intent to scare Mr. Spielberg? And on that, there's no doubt that the California Court of Appeal said merely, well, he was so strange and weird it was foreseeable that Raymer or somebody would have to report to Mr. Spielberg. That's not the test. And the difference between known or should have known in specific intent is critical from a due process perspective, and it's a meaningful distinction beyond a doubt because in 2002, the California legislature confronted a standard that would have reduced 646.9 to a defendant's knowing or should have known his conduct would reasonably cause fear. They rejected it. They said intent. They meant specific intent. It wasn't proved here, and, again, the wrong legal standard is applied by the California Court of Appeal. It's just absolutely inexplicable, untenable, and it resulted in a drastic change of statute. Not only was my client convicted on what Raymer did for the most part, but they then reduced the standard of proof on the mental intent, which to every defense lawyer is very often your bread and butter. You have a chance to show that nothing was intentionally done wrong. This person may have, you know, been there. They may have, Raymer and security may have inferred certain things because his conduct seemed weird. That doesn't mean my client intended it, that he intended to imply a threat. You're over time now, so. Thank you very much for your attention, Your Honor. Okay. Mayor for the government. May it please the Court, Deputy Attorney General Chung-Mar, further respond at the word. I believe I'm going to be very brief and won't take the 20-minute allocation. Really, the question of whether the stalker's conduct must be contemporaneous with the victim's fear. Could you speak up just a little? I can't hear you. I have a slight cold. Yeah, my cold settled in my ears, so we both have a problem. The question of whether the stalker's conduct must be contemporaneous with the victim's fear or awareness of the stalker's conduct or whether the victim can learn of the conduct through a third party are really interpretations of State law. And these were issues of State law which were resolved adversely to Petitioner. These questions were issues of State law because they involved an interpretation of the statute. And the State court opinion actually goes into looking at the language of the statute to see whether there is a contemporaneous requirement or whether a third party cannot be the vehicle for relaying the conduct to the victim. And the State court found those requirements wanting based upon the statutory language. As this court has repeatedly indicated on Federal habeas review, this court is bound by California's interpretations of its own law. And I think in a 2002 opinion, Holgerson v. Knowles, which I believe may have been actually written by Judge Wallace, that could be incorrect, this court reiterated that well established standard that a State court's interpretation of its own law, this court on Federal habeas review is bound by that. Petitioner claim is really inextricably linked and intertwined with these interpretations of State law. Because these issues of State law have been resolved adversely to Petitioner, it really takes the rug out from under many of Petitioner's arguments. I suppose there are two ways you can say there's a total absence of evidence. And then if the State court says, well, what we have satisfies the statute, that's a statutory interpretation, or is it just overlooking the fact that there's no evidence? There's certainly an extreme example where there would be no evidence to support such a, to support the juror's verdict. A State court could conceivably say that, you know, such evidence was not required under the statute. However, at some point, I would assume that a State court, a higher court, perhaps a California Supreme Court would at some point overrule such a holding. And certainly in a case like this, which was published by the California Court of Appeal, the California Supreme Court declined review. No other State court has criticized this holding. No other State court has found it wanting and criticized its reasoning. So that, this case would not be that extreme example. I could certainly foresee that such an example could exist. But it wouldn't be in this case, that there was sufficient quantum of evidence to satisfy the elements and the elements being defined and interpreted by the California Court of Appeal. Let me ask you a question. If Mr. Spielberg had sold this home 10 years earlier and this fellow thought it was a crime to steal his home and was around harassing the house, there wouldn't be a case, would there? I doubt a jury would find that the victim's here. I doubt the jury would find that. So conceptually, and that strikes me as logical, too, conceptually, what's the difference between that situation, that he sold the house, and that he's not living there, he's in a foreign country? Conceptually, what's the difference? The difference is that he will return to that residence. That is his primary residence. He will return. He just had his absence was serendipitous. Certainly, the defendant had no idea that Mr. Spielberg was not present at the home. Is that in the record? There's no – well, there's no evidence to support the inference that the defendant knew that Mr. Spielberg was absent. In fact, the evidence would support a contrary inference, because he comes to the gate and asks for Mr. Spielberg. Yeah. I assume so. In the hypothetical posed by Judge Wallace, where a defendant comes to a home that's been vacated for 10 years, and the former owner learns of this conduct, I would  guess the question is not whether a jury would find, but let's say the jury did find, could it be upheld on a habeas attack? It would depend on the context and whether there was further evidence, whether perhaps the defendant had possible avenues of finding the victim's current address. But, again, that example is really not consistent with the facts of this case. Well, I suppose the essential difference is that Spielberg would not return to the home if he had sold it, but he's going to return, I suppose, to his own home. Exactly. At some point. Exactly. You would say the causal connection is closer and there's a difference in kind. Exactly. That is his primary vote. He would be returning to that residence, and it would be, obviously, the stalker knows of Mr. Spielberg's primary residence. So there has to be some limit on this somewhere. There has to be some limit, just that that limit has not been crossed in this case. But your view is, in this case, under the laws California has decided, a jury could reasonably find that there was the elements of stalking were determined in this case. That is correct, Your Honor. But you have to rely upon the information that was given by the lawyer, which was added, apparently information was added that he had found out through investigators. That is true. The lawyer did not only notify Mr. Spielberg of just the stalker's conduct, just his request, but he also informed Mr. Spielberg, I believe, of his statements. I think I may be incorrect. But the first, the first, the lawyer did contact Mr. Spielberg over a course of time. There was not just one conversation. The first conversation, I believe, was mostly directed toward Petitioner's conduct. And that first conversation between the lawyer and Mr. Spielberg occurred only six days after the last incident, which was before the defendant really made the bulk of his comments and statements regarding his intent toward Mr. Spielberg. And that first phone call from Mr. Raymer to Mr. Spielberg, the contents of that phone call certainly alarmed and terrorized Mr. Spielberg and the evidence to support that inference. And unless there are any further questions I would submit, I realize that I have plenty of time left. There's no requirement to use it all. Thank you, Your Honor. Thank you. The case is here to be submitted, and we will be in adjournment for this morning's session. Good arguments. Good arguments. Yes. This court, for this session, stands adjourned. Thank you.
judges: Wallace, Canby, Thomas